# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| KIMBERLY K. BALDWIN,     ) | |
|            ) | |
|     **Plaintiff,**    ) | |
|            ) | |
| **v.**            ) | **CAUSE NO. 1:16-cv-00123-SLC** |
|            ) | |
| **COMMISSIONER OF SOCIAL**   ) | |
| **SECURITY,** *sued as Nancy A. Berryhill,*  ) | |
| *Acting Commissioner of SSA,*[1]   ) | |
|            ) | |
|     **Defendant.**    ) | |

## OPINION AND ORDER

Plaintiff Kimberly K. Baldwin appeals to the district court from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application under the Social Security Act (the "Act") for disability insurance benefits ("DIB").[2] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

### I.  PROCEDURAL HISTORY

Baldwin applied for DIB in March 2013, alleging disability as of August 15, 2006. (DE 8  Administrative Record ("AR") 167-77). She was last insured for DIB on December 31, 2011 (AR 195); therefore, she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled as of her date last insured in order to recover DIB benefits).

The Commissioner denied Baldwin's application initially and upon reconsideration. (AR

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (DE 12); *see* 28 U.S.C. § 636(c).

111-19).  A hearing was held on August 14, 2014, before Administrative Law Judge Maryann S. Bright ("the ALJ"), at which Baldwin, who was represented by counsel, and a vocational expert, Sharon Ringenberg (the "VE"), testified.  (AR 55-98).  On October 31, 2014, the ALJ rendered an unfavorable decision to Baldwin, concluding that she was not disabled because she could perform her past relevant work as a warehouse worker, as well as a significant number of other unskilled, medium-exertional jobs in the economy.  (AR 34-49).  The Appeals Council denied Baldwin's request for review (AR 1-7), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

Baldwin filed a complaint with this Court on April 11, 2016, seeking relief from the Commissioner's decision.  (DE 1).  Baldwin advances just one argument in this appeal—that the ALJ failed to adequately account for her deficits in concentration, persistence, or pace in the RFC and the hypothetical questions posed to the VE.  (DE 17 at 9-11).

## II.  FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Baldwin was 56 years old (AR 167); had a high school education (AR 200); and possessed past work experience as a warehouse worker (from 2000 to 2006) and a florist worker (from 1995 to 1999) (DE 200).  Baldwin alleges disability due to a major depressive disorder, a bipolar I disorder, and post traumatic stress disorder ("PTSD").  (DE 17 at 2).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 457-page administrative record necessary to the decision.

### A. *Baldwin's Testimony at the Hearing*

At the hearing, Baldwin testified as follows: She is divorced and has three adult children. (AR 64-65). For the past two years, she had been living alone in a house, but prior to that her boyfriend lived with her for six years. (AR 64, 75). She has income through two rental properties that she owns, and she drives a car several times a week. (AR 65-66). She was laid off from her job in 2006 along with other workers; she was let go from another job because her employer thought she was stealing. (AR 67-68). When she was employed, she missed about six weeks of work a year, using all of her vacation, personal, and sick days. (AR 69, 76, 82-83). She did not have health insurance from 2006 to 2011, but her family doctor provided her with free care. (AR 73-74).

When asked why she thought she could not work since before her date last insured, Baldwin stated that she could "hardly function just doing what I have to do." (AR 72, 88). Yet, Baldwin also stated that the medications provided by her doctor were effective. (AR 74). She had recently started attending counseling. (AR 75). In 2011, she was drinking alcohol (one or two bottles of wine or eight beers) three times a week, but she quit drinking after having gallbladder surgery in 2012. (AR 76). She drank alcohol during the period that she was employed, but it never caused her to miss work. (AR 77). She used to smoke marijuana and use her friend's prescription drugs, but she no longer did so. (AR 78-79).

Baldwin's typical day from 2006 to 2011 included staying home, performing household tasks such as doing dishes and cleaning, maintaining a garden, and crying in her room. (AR 79-80, 84, 89). Baldwin also visited her father in a nursing home two times a week and occasionally went to a neighbor's house to listen to a band or went out with a girlfriend. (AR 79-80, 84, 89-

3

90).  Baldwin claimed that she often went four or five days without bathing, and that her boyfriend took care of much of the property.  (AR 88).  She experienced a lot of anxiety when around other people.  (AR 89).  She had experienced a traumatic event as a teenager and suffered from bad memories and nightmares.  (AR 84-85).  She had suicidal thoughts from time to time prior to her alleged onset date.  (AR 88).  She had difficulty with focus and concentration—for example, she would start something on the stove and then forget and leave the room.  (AR 85, 89).

## B.  Summary of the Relevant Medical Evidence
### Prior to Baldwin's Date Last Insured

From mid-2001 through 2005, Baldwin was seen at the Caylor Nickel Clinic for a variety of complaints.  (AR 386-437).  She was diagnosed with depression and anxiety and was prescribed medications.  (AR 386, 388-89, 397, 419, 432-33, 435-37).  In September 2005, the treating physician indicated that Baldwin was "was under a tremendous amount of stress dealing with family issues, also finalizing a divorce," noting that Baldwin wanted to take some family medical leave from her job.  (AR 386).  Baldwin was not treated by a mental health professional during this period.

In November 2008, Baldwin saw Dr. Milus Skidmore, her family physician, for complaints of depression.  (AR 332).  He administered a self-rating depression scale, the results of which revealed "severe extreme depression."  (AR 332-33).  He diagnosed her with depression and started her on Fluoxetine.  (AR 332).

Baldwin returned to Dr. Skidmore in May 2009 for a follow-up on her depression.  (AR 332).  She was five feet, five inches tall and weighed 163 pounds; she expressed an interest in

starting a weight loss program.  (AR 332).  Dr. Skidmore diagnosed her with depression and being overweight.  (AR 332).  He increased her Fluoxetine and also prescribed Phentermine, a weight loss drug.  (AR 332).  A month later, Baldwin reported that she was feeling better with respect to her depression and was doing well on her medications.  (AR 331).  In July, Baldwin stated that she still had depression but that she was doing "ok" on medications; she reported that she was dieting and gardening.  (AR 330).  In August, Baldwin reported that she still had depression, but that her medications were helping.  (AR 329).  She was working in the garden and around the house; her mother had passed away recently.  (AR 328).  In December, Baldwin stated that she was doing "ok" as to her depression; she had gone off Phentermine, but wanted to resume it.  (AR 326-27).

In April and May 2010, Baldwin again reported that she was "doing ok" on her medications.  (AR 323-24).  In September, Baldwin told Dr. Skidmore that her diet pills were helping with her depression and lack of energy.  (AR 322).  In October, she stated that she was "doing ok," but felt depressed, tired, and lethargic.  (AR 321).

In March 2011, Baldwin reported that she was more snappy with people.  (AR 318).  Dr. Skidmore indicated that Baldwin was positive for crying, sadness, tiredness, and lethargy.  (AR 318).  A mood questionnaire indicated that she was very depressed.  (AR 318-20).  The next month, Baldwin stated that she was "doing ok" but that she had decreased energy.  (AR 317).  In June, she reported very low energy and tearfulness, but she had been out of her medications for a while; she acknowledged that her medications were helpful.  (AR 316).  She denied any suicidal ideation.  (AR 316).  In August, Baldwin reported that Prozac was helping, but that she still felt sad and was not doing well; she had been off of Fluoxetine and Phentermine.  (AR 315).  In

October, Baldwin was again "doing ok," but she still felt depressed and anxious. (AR 314). Dr. Skidmore documented that Baldwin's mood and affect were "ok." (AR 314). In November, Baldwin reported the same, and Dr. Skidmore indicated that she was positive for sadness. (AR 313). In December, Baldwin indicated that she was doing better, though she still had depression. (AR 312).

### C. Summary of the Relevant Medical Evidence
### After Baldwin's Date Last Insured

In January 2012, Baldwin continued to report depression, but stated that her medications helped motivate her; Dr. Skidmore found that she was positive for sadness. (AR 311). In March, Baldwin stated that she felt better on her medications, was not suicidal, and that she was doing well with Phentermine. (AR 310). In April, Baldwin indicated that she was crying all of the time; her mood was flat, and she appeared sad. (AR 309). In June, Baldwin told Dr. Skidmore that she has a hard time if she does not take Phentermine; her boyfriend wanted to move out. (AR 309). In August, she said that everything was about the same, and that on some days she just wants to stay home. (AR 306). In December, she reported that everything was "ok." (AR 304).

In March 2013, Baldwin called Dr. Skidmore and said that she was depressed, but not suicidal, and that she wanted to restart Prozac and Phentermine. (AR 304). She called again a month later, reporting that she felt stressed; she was instructed to go to Cornerstone if she felt suicidal. (AR 304). In May, Baldwin said that she was doing better as to her mental status. (AR 365).

On May 1, 2013, Baldwin underwent an evaluation at Grant Blackford Mental Health.

(AR 334-42). Baldwin was a poor historian and had poor concentration. (AR 334). She stated that she had been prescribed Prozac for the past few years, but was not always compliant with taking it because she would forget to do so. (AR 334). She had been drinking a bottle of wine or six to eight beers each day prior to her September 2012, when she had gallbladder surgery. (AR 335). She had since significantly reduced her alcohol intake, but was still drinking a bottle of wine each week. (AR 335). She also was taking a Xanax or an opiate about once a week if someone gave her one, and was smoking marijuana when she could get it from friends. (AR 335). She was diagnosed with a major depressive disorder, recurrent, severe without psychotic features; bipolar disorder, most recent episode mixed, severe without psychotic features; PTSD; and alcohol dependence. (AR 341). She had significant problems with sleep deprivation, thinking through issues, and anticipating consequences; mild problems with self care, impulse control, and interpersonal issues; some problems with controlling anger; and severe "work problems." (AR 341-42). She was assigned a Global Assessment Functioning ("GAF") score of 25.[4] She was admitted for stabilization and to assess her need for medication. (AR 342).

On May 9, 2013, Kenneth Neville, Ph.D., a state agency psychologist, reviewed

_____

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several clinicians of record used a GAF score in assessing Baldwin, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

Baldwin's record and concluded that there was insufficient evidence prior to her date last insured of December 31, 2011, to assess disability. (AR 101-02). Consequently, Dr. Neville found that Baldwin did not have a medically determinable mental impairment prior to her date last insured. (AR 101-02). Joelle Larsen, Ph.D., another state agency psychologist, reached the same conclusion on June 11, 2013. (AR 107-08).

On May 21, 2013, Baldwin was seen by Dr. Gregory Richardson at Grant Blackford Mental Health. (AR 352). She expressed frustration at dealing with a dysthymic disorder. (AR 352). She denied feeling suicidal and stated that she had been working at appreciating things and had started psychotherapy. (AR 352). Dr. Richardson assessed a GAF score 40 and prescribed a high dose of Trazodone. (AR 353).

In July 2013, Baldwin reported to Dr. Skidmore that she was involved in therapy at Cornerstone; that she had been diagnosed with PTSD, dysthymic disorder, bipolar disorder, and severe depression; and that Cornerstone had added Trazodone. (AR 362). In December, she reported getting Prozac again. (AR 369).

In January 2014, Baldwin complained to Dr. Skidmore of trouble concentrating when she was off of her medications; she still reported sadness, but that Prozac helped. (AR 368). On August 19, 2014, Dr. Skidmore wrote a letter stating that Baldwin "had ongoing severe depression documented as far back as November 14, 2008," and that she had been hospitalized in May 2013 for her depression. (AR 451).

In February 2014, Baldwin returned to Dr. Richardson. (AR 374-75). A mental status exam revealed a depressed mood and affect, but a cooperative attitude, logical thought process, appropriate thought content, normal cognition, average intelligence, adequate judgment, intact

insight, grossly appropriate memory, and intact attention and concentration. (AR 375). She denied any hallucinations or suicidal thoughts. (AR 375).

On August 27, 2014, Becky Kovacs, a licensed social worker at Grant Blackford Mental Health, wrote a letter to Baldwin's attorney, gleaning symptoms of depression and anxiety from the records of Dr. Skidmore and Dr. Ingram in 2010 and 2011. (AR 453-54). These symptoms included lethargy, trouble sleeping, fatigue, irritability, sadness, crying, depression, and anxiety. (AR 453). Ms. Kovacs asserted that the symptoms gleaned from Dr. Ingram's records are consistent with a diagnosis of major depressive disorder, further noting that Dr. Ingram treated Baldwin's mental illness with the Prozac during 2010 and 2011. (AR 454). Ms. Kovacs also wrote that Baldwin indicated to her that she likely has the complication of "psychotic features" with the disorder, though no notes in any records reflect this concern. (AR 454). Ms. Kovacs further stated that Baldwin had no insurance during 2010 and 2011 and was unable to commit to ongoing mental health care, and that she spent much of her time alone in her house, isolating from others and ignoring her gardening and housekeeping duties. (AR 454). Ms. Kovacs opined that Baldwin's impairments in her social and home life had been apparent for a considerable number of years and continued to the present time. (AR 454).

### D. Testimony of the VE

At the hearing, the ALJ posed a series of hypotheticals to the VE, to which the VE testified as follows:

> Q    Assume a hypothetical individual with the past jobs you
>      described, is capable of work at all exertional levels, except
>      the ind[ividual] is unable to engage in complex or detailed
>      tasks but can perform simple, routine, and repetitive tasks
>      consistent with unskilled work and is able to sustain and

attend to tasks throughout the eight-hour workday. Could the hypothetical individual perform any of the past work?

A Yes, the job of a warehouse worker both as it's typically performed in the national economy and as the claimant performed it.

Q Now if the individual were limited to low stress work defined as having only occasional decision-making required and only occasional changes in the work setting, would your answer change?

A That would not change my answer.

Q Okay. What if the individual were limited to superficial interaction with co-workers, supervisors, and the public with superficial interaction defined as occasional and casual contact, not involving prolonged conversation or discussion of involved issues while contact with supervisors still involves necessary instruction?

A I don't think that would change my answer either.

Q What if the individual is best suited to working in semi-isolation from others or as part of a small group?

A I think I would eliminate the past work. There would be other jobs that would be consistent with your hypothetical. The job of an industrial cleaner, it is medium, SVP 2, there is 1,000 in the state of Indiana, 50,000 in the nation, it's DOT 381-687-018. The job of a laundry worker I, it is medium, SVP 2, there's 3,000 in the state of Indiana, 150,000 in the nation, it's DOT 361.684-014. And the job of an automobile detailer, it is medium, SVP 2, there's 1,500 in the state of Indiana, 50,000 in the nation, it's DOT 915.687-034.

(AR 93-94).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are

11

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On October 31, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 34-49). The ALJ noted that Baldwin last met the insured status requirements of the Act on December 31, 2011. (AR 36). At step one, the ALJ found that Baldwin had not engaged in substantial gainful activity after her alleged onset date of August 15,

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

2006, through her date last insured of December 31, 2011. (AR 36). At step two, the ALJ found

that Baldwin's major depressive disorder and anxiety were severe impairments as of her date last

insured. (AR 37).

At step three, the ALJ concluded that as of her date last insured Baldwin did not have an

impairment or combination of impairments severe enough to meet or equal a listing. (AR 38).

Before proceeding to step four, the ALJ determined that Baldwin's symptom testimony was "not

fully credible" (AR 39), and assigned her the following RFC:

> [T]hrough the date last insured, the claimant had the physical
> [RFC] to perform a full range of work at all exertional levels. She
> could not perform complex or detailed tasks, but retained the
> mental [RFC] to perform simple, routine, and repetitive tasks
> consistent with unskilled work and could sustain and attend to a
> task throughout the eight-hour workday. She was limited to low
> stress work defined as having only occasional decision making
> required and only occasional changes in the work setting. As to
> social contacts, she was limited to superficial interactions with co-
> workers, supervisors, and the public with superficial defined as
> occasional and casual contact not involving prolonged
> conversation or discussion of involved issues. Her contact with
> supervisors could have still involved necessary instruction.

(AR 39). At step four, based on the assigned RFC and the VE's testimony, the ALJ concluded

that Baldwin could perform her past relevant work as a warehouse worker, both as it is generally

performed and as Baldwin performed it. (AR 47). The ALJ concluded at step five, alternatively,

that Baldwin could also perform a significant number of unskilled, medium-exertional jobs in the

economy, including industrial cleaner, laundry worker, and automobile detailer. (AR 48).

Therefore, Baldwin's application for DIB was denied. (AR 48-49).

### C. The ALJ Adequately Accounted for Baldwin's Mental Limitations in the RFC and in the Step-Five Hypotheticals

Baldwin's sole argument on appeal is that the ALJ failed to adequately account for her mental limitations in the RFC and in the hypotheticals posed to the VE at step five. Specifically, Baldwin argues that the ALJ erred by failing to incorporate into the RFC and into the hypotheticals her step-three finding that Baldwin had moderate deficits in maintaining concentration, persistence, or pace. Ultimately, Baldwin's argument does not warrant a remand of the Commissioner's final decision, as the assigned RFC and the step-five hypotheticals adequately account for her mental limitations prior to her date last insured.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). "[T]he limitations identified in the 'paragraph B' criteria . . . are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." SSR 96-8p, 1996 WL 374814, at *4; *see Virden v.*

*Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). "RFC is

what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at

*2; *see* 20 C.F.R. § 404.1545(a)(1). "The RFC assessment must be based on *all* of the relevant

evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §

404.1545(a)(3). That is, "[i]n assessing RFC, the adjudicator must consider limitations and

restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at

*13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ

concluded that Baldwin had moderate difficulties in maintaining concentration, persistence, or

pace, as well as moderate restrictions in activities of daily living and in maintaining social

functioning. (AR 38). When proceeding to step four, the ALJ assigned Baldwin the following

mental RFC, in relevant part:

> [Baldwin] could not perform complex or detailed tasks, but
> retained the mental [RFC] to perform simple, routine, and
> repetitive tasks consistent with unskilled work and could sustain
> and attend to a task throughout the eight-hour workday. She was
> limited to low stress work defined as having only occasional
> decision making required and only occasional changes in the work
> setting.

(AR 39).

Baldwin asserts that the foregoing restriction is inadequate because it did not expressly

include the ALJ's finding at step three that she had moderate difficulties in maintaining

concentration, persistence, or pace. Baldwin argues that in most cases, incorporating terms like

"simple, repetitive tasks" or "unskilled work" on their own will not necessarily exclude from the

VE's consideration those jobs that present significant problems of concentration, persistence, or pace. (DE 17 at 10).

The Seventh Circuit Court of Appeals has instructed that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."). Having said that, the Seventh Circuit has not insisted "on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." *Id.* at 619. The court explained:

> We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.

*Id.* at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a hypothetical restricting the claimant to work involving low production standards and a low-stress environment, where the claimant's difficulties with concentration, persistence, or pace arose from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the

ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of stress" adequately accommodated the claimant's concentration problems arising, in part, from a panic disorder)).

"In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to repetitive tasks with simple instructions did not necessarily account for the claimant's depression-related problems in concentration, persistence, and pace) (collecting cases); *see also Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the claimant's concentration problems stemming from depression and a psychotic disorder). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15, 1985 WL 56857, at *6.

Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ crafted an RFC and step-five hypotheticals that addressed both the complexity of the tasks that Baldwin could perform and her ability to complete such tasks over a sustained period. To address complexity, the ALJ stated that Baldwin "could not perform complex or detailed tasks, but retained the mental [RFC] to perform simple, routine, and repetitive tasks consistent with unskilled work[.]" (AR 39). And to address the ability to stick with a given task over a sustained period, the ALJ stated that Baldwin "could sustain and attend to task throughout the eight-hour workday." (AR 39). Thus, the ALJ did not run afoul of the Seventh Circuit's instruction in *O'Connor-Spinner* to address both the complexity of the tasks the claimant can perform and the claimant's ability to stick with the tasks over a sustained period. 627 F.3d at 620.

While the ALJ did not rely on any particular medical source opinion when assigning this RFC, "the lack of an articulated RFC limitation by a record physician does not preclude the ALJ from formulating [her] own RFC limitations." *Terry v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011). "Instead, the RFC determination is one firmly within the ALJ's discretion to determine, so long as [she] sufficiently articulates [her] reasoning and the record adequately supports [her] conclusion." *Id.* (citing 20 C.F.R. §§ 404.1546(c), 404.1527(e)(2) and collecting cases). Here, the record is devoid of any medical source opinion

prior to the date last insured that specifically addresses Baldwin's deficits in concentration, persistence, or pace. (*See* AR 451; *see also* AR 453-54). As such, the ALJ's lack of citation to a record medical opinion that specifically opined a limitation to simple, routine, and repetitive tasks "is the result of [a] limited record rather than an analytical fault of the ALJ." *Terry*, 2011 WL 855346, at *18. That is, the ALJ could not have cited a medical opinion for the specific RFC limitation to "simple, routine and repetitive tasks," even if she wanted to.

Furthermore, although in August 2014 Ms. Kovacs retrospectively opined that Baldwin was in a "nearly non-functional state" in 2010 to 2011 (AR 454), and Dr. Skidmore retrospectively opined that Baldwin "had ongoing severe depression documented as far back as November 14, 2008" (AR 451), "[a] retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." *Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th cir. 2009) (citations omitted). Here, there is no contemporaneous evidence during the eligible period demonstrating that Baldwin was in a nearly non-functional state prior to her date last insured. Rather, Dr. Skidmore's treatment records from 2010 and 2011 reveal that Baldwin was "doing ok" and that her medications were helpful in controlling her symptoms. (*See* AR 312-24). While Baldwin herself testified that her mental limitations were severe during the relevant period, the ALJ found her testimony "not fully credible" (AR 39), a finding which Baldwin does not challenge on appeal.

In any event, "the fact that [Baldwin] had 'moderate difficulties' for the purposes of step three does not necessarily mean that [she] also had moderate functional limitations that had to be included in the RFC." *Curley v. Berryhill*, No. 1:16-cv-01773-SEB-MJD, 2017 WL 2427711, at *3 (S.D. Ind. May 12, 2017). That is, "[i]t is not enough for plaintiff simply to allege that the administrative law judge generally failed to take into account her difficulties with 'concentration,

persistence, or pace' because that step three finding is not a limitation in and of itself[.]" *Cihlar v. Colvin*, No. 15-cv-560-bbc, 2016 WL 4742341 at *4 (W.D. Wis. Sept. 12, 2016), *aff'd*, 706 F. App'x 881 (7th Cir. 2017). Rather, the ALJ's step-three finding "is merely a way for the administrative law judge to describe and assess the severity of plaintiff's actual, credible mental health limitations at step three of the five-step sequential evaluation process." *Id.*

When assigning the RFC, the ALJ acknowledged Baldwin's testimony at the hearing that she "had difficulty concentrating and focusing and could not remember what was going on." (AR 46, 85 ("It's like I can't even remember what I'm doing half of the time.")). However, at the same time, the ALJ considered that at Baldwin's interview with the Social Security Administration one month after the hearing, the examiner documented that Baldwin had no difficulty concentrating during the interview and that she was able to answer all questions pertaining to her work and medical history. (AR 46 (citing AR 196)). The ALJ also observed that in January 2014, Dr. Skidmore indicated that Baldwin had trouble concentrating *when she was off of her medications*, and that in February 2014, Dr. Richardson found that her attention and concentration were intact. (AR 44-46, 368, 375). Additionally, the ALJ gave some weight to the statement of Baldwin's friend, Rosie Plummer, who indicated that Baldwin followed spoken instructions very well and could handle a savings account, pay bills, use a checkbook, and count change. *See Cihlar v. Berryhill*, 706 F. App'x 881, 882 (7th Cir. 2017) (considering the claimant's daily activities, which included keeping track of her finances and gardening, when concluding that the ALJ had adequately accounted for the claimant's deficits in concentration, persistence, or pace when posing the hypothetical to the VE). As such, the Court is able to trace the ALJ's logic with respect to her conclusion that Baldwin's medications adequately controlled

her symptoms prior to her date last insured.  (AR 44).

Thus, it is apparent that the ALJ considered Baldwin's claim of concentration problems not only at step three, but also when assigning the RFC.  (AR 38, 46).  Ultimately, the ALJ concluded that while Baldwin had moderate deficits in concentration, persistence, or pace for purposes of step three, she still had adequate attention, concentration, and persistence to sustain the performance of simple, routine, and repetitive tasks throughout an eight-hour workday.[6]  *See, e.g.*, *Elliott v. Berryhill*, No. 1:16-cv-309-WTL-DML, 2017 WL 3613671, at *2-3 (S.D. Ind. Aug. 23, 2017) (finding that the ALJ avoided the *O'Connor-Spinner* error by explaining that the claimant's ability to concentrate was higher when limited to simple and repetitive tasks).  And the ALJ incorporated other restrictions as well into Baldwin's RFC, including a limitation to "low stress work" with "only occasional decision making" and "only occasional changes in the work setting."  (AR 39).  Additionally, the ALJ included various restrictions designed to account for Baldwin's difficulties in maintaining social functioning.  (AR 39).  The Court concludes that in this particular instance, these mental restrictions in the RFC, taken together, adequately account for Baldwin's credible concentration and persistence limitations prior to her date last insured.  *See Cihlar v. Berryhill*, 706 F. App'x 881, 882 (7th Cir. 2017) (concluding that the ALJ's hypotheticals to the VE "adequate account[ed] for Cihlar's credible concentration and persistence limitations" even though "the ALJ did not use the magic words 'concentration' or 'persistence'").

---

[6] Moreover, at step two, the ALJ stated that Baldwin's depression and anxiety "limited her capacities to perform the mental demands of work *with respect to complex and detailed work tasks*, workplace stress, and social interactions."  (AR 42).  Thus, it is clear that the ALJ did not view Baldwin's deficits in concentration, persistence, or pace as affecting her performance of simple, repetitive tasks.

In sum, it is "the claimant [who] bears the burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert* , 482 U.S. 137, 146 n.5 (1987)); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)).  Here, Baldwin has failed to carry her burden of demonstrating that her mental deficits in concentration, persistence, or pace prior to her date last insured required a more significant restriction than that assigned by the ALJ.  *See, e.g.*, *Terry*, 2011 WL 855346, at *17.  Accordingly, the Commissioner's final decision will be AFFIRMED. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

## V.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Baldwin.

SO ORDERED.

Entered this 8th day of March 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge